UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

WELDON B. BRYANT,           )
                            )
              Petitioner,   )
                            )
    vs.                     )          Case No. 1:11CV00041 SNLJ
                            )
UNITED STATES OF AMERICA,   )
                            )
              Respondent.   )

## MEMORANDUM AND ORDER

This case is a motion under 28 U.S.C. § 2255 to vacate, set aside or correct sentence by

Weldon B. Bryant, a person in federal custody.  On February 13, 2009, Bryant was found guilty

by a jury of the offense of mail fraud and, on June 24, 2009, this Court sentenced Bryant to the

Bureau of Prisons for a term of 18 months, a sentence within the sentencing guideline range.

Bryant's § 2255 action, which is based on several allegations of ineffective assistance of counsel,

is fully briefed and ripe for disposition.

## FACTS

**A.      The Indictment.**

On September 18, 2008, a Grand Jury in the Eastern District of Missouri, Southeastern

Division, returned a four-count Indictment against Weldon B. Bryant. The general allegations of

the Indictment were that Bryant engaged in a scheme where he received payments from an

insurance company by using the United States Postal Service to obtain these payments by

submitting false and fraudulent claim forms to that insurance company in violation of Title 18,

U.S.C. § 1341. Count I of the Indictment charged that, on or about November 16, 2005, Bryant

submitted a false and fraudulent claim form to the John Hancock Life Insurance Company in the

amount of $2,310.00, in which Bryant represented that Jesse White had provided skilled nursing care to Eleanor Bryant, and that Bryant intended to defraud the insurance company. Count II of the Indictment charged that, on or about January 17, 2006, Bryant submitted a false and fraudulent claim form to the John Hancock Life Insurance Company in the amount of $1, 050.00, in which Bryant represented that Jesse White had provided skilled nursing care to Eleanor Bryant, and that Bryant intended to defraud the insurance company. Count III of the Indictment charged that, on or about July 19, 2006, Bryant submitted a false and fraudulent claim form to the John Hancock Life Insurance Company in the amount of $8,340.00, in which Bryant represented that Jesse White had provided skilled nursing care to Eleanor Bryant, and that Bryant intended to defraud the insurance company. Count IV of the Indictment charged that, on or about January 18, 2007, Bryant submitted a false and fraudulent claim form to the John Hancock Life Insurance Company in the amount of $2,100.00, in which Bryant represented that Jesse White had provided skilled nursing care to Eleanor Bryant, and that Bryant intended to defraud the insurance company. On September 22, 2008, Bryant was arrested and made his initial appearance on the federal charges. Bryant was released on a $10,000.00 unsecured bond. After the initial appearance, the Federal Public Defenders Office was appointed to represent Bryant. Bryant was arraigned on September 24, 2008. At that arraignment, Bryant pled not guilty to the charges.

**B.** **Pretrial Motions.**

On November 5, 2008, Bryant filed his Waiver of Filing of Pretrial Motions. On November 10, 2008, Bryant appeared with his attorney, Michael A. Skrien, and waived his right to file pretrial motions in his case in a hearing before United States Magistrate Judge Audrey G. Fleissig. The case was set for a jury trial on December 17, 2008.

Bryant was serving a period of probation in an unrelated state case at the time of his federal indictment. Bryant's state case was a conviction for Possession of a Controlled Substance - Crack Cocaine. On November 14, 2008, the state court judge suspended Bryant's probation and placed him in custody. The Government obtained a writ to have Bryant present for his federal prosecution.

On December 9, 2008, Bryant's attorney, Michael A. Skrien, filed a motion to continue the trial setting. Bryant executed a Waiver of Speedy Trial, which was also filed with the District Court. On December 9, 2008, the District Court granted Bryant's motion to continue the trial setting. Bryant's case was given a new trial setting of January 28, 2009.

On January 6, 2009, Federal Public Defender Scott F. Tilsen entered his entry of appearance on Bryant's case. Federal Public Defender Michael A. Skrien was allowed to withdraw as Bryant's attorney.

On January 20, 2009, attorney Scott F. Tilsen filed a motion to continue the trial setting. That motion was granted and the trial was continued until February 12, 2009.

### C.    Trial.

On February 12, 2009, Bryant appeared with his attorney to begin his jury trial on the Indictment. The Government moved to dismiss Count I of the Indictment prior to the submission of any evidence. That motion was granted. The Government and Bryant presented evidence until February 13, 2009. That evidence is summarized below.

On June 20, 2000, Bryant's mother, Eleanor Bryant ("Eleanor") applied for a policy of long term health care insurance from the John Hancock Life Insurance Company. That insurance policy was issued by John Hancock on July 15, 2000. The policy provided for reimbursement of

actual expenses incurred on behalf of Eleanor for nursing care, home health care and assisted living expenses required by her. That policy has continued to be in force from the day it was issued to the present day. (Tr. I, p. 32 - 36.)

The insurance policy would only reimburse Eleanor's covered expenses up to a total of $70 per day and up to a total payment of $153,300. The first 100 days that Eleanor required health care were not covered for reimbursement under the policy elimination period. (Tr. I, p. 36, 37.) Covered expenses may be recovered from the John Hancock Life Insurance Company by filing a Custodial Nursing Care Questionnaire ("CNCQ form"). That form is provided by the insurance company and requires the claimant to provide the name of the caregiver, the claim number, the insurance policy number, the hours worked by the caregiver, the rate of pay, the total charges and dates of service provided by the caregiver. Both the caregiver and the person claiming the right to reimbursement are required to sign the CNCQ form. The true identity of the caregiver is important to the insurance company in order to make sure that the bill is for actual services provided to an insured. All CNCQ forms are reviewed by John Hancock Life Insurance Company personnel prior to payment. All CNCQ forms are received by the John Hancock Life Insurance Company by United States mail. (Tr. I, p. 38 - 46.)

In 2005, Eleanor became eligible for covered services under the policy because she was diagnosed with Alzheimer's. Claims were filed for reimbursement of covered expenses under the insurance policy by the defendant. The CNCQ forms submitted by Bryant for these reimbursements showed that the home health care services were provided by Certified Nurses Assistant Jesse White. A series of CNCQ forms was mailed to the John Hancock Insurance Company by Bryant from January, 2005 until January, 2007, for services provided by Jesse

White for Eleanor. A portion of those invoices covered the period from November, 2005, until January, 2007. The total payments made by John Hancock Life Insurance Company to Bryant for CNCQ forms alleging services rendered by Jesse White caring for Eleanor from November 2005, until January, 2007, was $29,440. During that time, Bryant submitted a total of thirteen CNCQ forms requesting reimbursement from the John Hancock Insurance Company. Those forms represented that Jesse White performed nursing care services for Eleanor and that his fees were paid by Bryant. (Tr. I, p. 46 - 58, 120, Exh. 5A - 5M.)

Jesse White met Bryant in 2005 when White was seeking employment from persons needing general yard and home maintenance work. Bryant hired White to perform some yard work at Bryant's Fairdealing home during the summer of 2005. Both Bryant and Eleanor lived in a home on that Fairdealing property. During that period of time, Bryant asked White to help care for Bryant's mother, Eleanor. White was licensed as a Certified Nurses Assistant at the time. White agreed to help care for Eleanor and was paid $10 per hour for that work. White helped Eleanor with her shopping, cleaning and making sure that she didn't accidentally hurt herself. He worked sporadically, but not every day, during 2005.

White stopped caring for Eleanor around October 1, 2005. In 2006, White moved to the Kansas City area where he started working for LaFarge, a local Kansas City employer. White's first work day was May 22, 2006. His employment with LaFarge ended on September 8, 2008. He worked twelve hour days, working either three or four days each week. White did not perform any services for Eleanor during the period of time he worked for LaFarge in Kansas City, Missouri. It was about a seven hour drive from Kansas City, Missouri, to Eleanor's home in Fairdealing, Missouri. (Tr. I, p. 123 - 125, 144, 145.)

In October, 2005, Bryant called White to ask if he would sign some replacement CNCQ forms. Bryant told White that Bryant had lost the original forms for Eleanor's care and needed new forms signed so Bryant could be reimbursed by the insurance company. White agreed to sign those replacement forms. White drove to a restaurant in Poplar Bluff, Missouri, and met with Bryant. While there, White signed about ten CNCQ forms supplied by Bryant. White did not believe that the forms were filled out at the time he signed them. (Tr. I, p. 126 - 128.)

About two weeks after signing the replacement invoices, Bryant called White again. During this conversation, Bryant told White that he had lost the forms and needed White to sign another group of forms. White agreed to do this and drove to Bryant's home in Fairdealing for this purpose. White met Bryant there and signed another ten CNCQ forms that were blank. White did not receive any money for signing the replacement forms. (Tr. I, p. 129, 130, 142.)

In January, 2007, Martin St. John was a senior investigator for the John Hancock Life Insurance Company. He was assigned to look into the propriety of payments made to Bryant as reimbursements under Eleanor's long term care policy. St. John went to the home of Bryant in Fairdealing, Missouri, to speak with Bryant about the payments. St. John arrived on January 12, 2007, around 9:00 a.m. Bryant was at his home at the time St. John arrived. Eleanor was then in St. Louis with another son, Fred Bryant (Fred). (Tr. I, P. 78, 79.)

St. John asked Bryant who cared for Eleanor when she was living in Fairdealing with him. Bryant stated that Jesse White took care of Eleanor during the day and that Debra Lindsey cared for her during the evenings. Bryant stated that Ms. Lindsey was not a licensed caregiver. St. John asked for any receipts that Bryant might have for payments that he made to Ms. Lindsey. Bryant stated that he did not have any receipts; that he paid Ms. Lindsey in cash. St. John then

asked for the telephone numbers of Jesse White and Debra Lindsey. At that request, Bryant's demeanor changed. Bryant told St. John that St. John did not need any receipts and that St. John needed to get out of his house. Bryant attempted to block St. John's exit from the home. St. John told Bryant that he would call the police if he were not allowed to leave. Bryant then allowed St. John to leave the property. (Tr. I, p. 81 - 84.)

A few days later, on January 18, 2007, Timothy Springer, another John Hancock Life Insurance Company investigator, then called Bryant to investigate the claims made for care of Eleanor. Springer was the Associate Director of Investigative Services for the insurance company. At the beginning of their conversation, Bryant told Springer that his company was harassing Bryant and that Springer was not permitted to contact Debra Lindsey. Springer responded by telling Bryant that he would continue to pursue the investigation. Later, Bryant told Springer that Jesse White had moved to St. Louis about three weeks prior to their conversation. He said that White was working for a nursing home in St. Louis and that, prior to that move, White had lived in Bryant's home for the previous two to three years. Bryant said that if Springer wanted to mail any letters to White, Springer should mail those to Bryant's address. Bryant gave Springer a telephone number for Jesse White, but that number turned out to have been disconnected. (Tr. I, p. 95 - 100.)

Eventually, Springer made contact with Jesse White. Springer interviewed White at the Kansas City airport, where White told Springer about White's care of Eleanor. White had signed some of the CNCQ forms while he worked caring for Eleanor. Bryant filled out those forms and submitted them to the insurance company for reimbursement. (Tr. I, p. 122, 130, 142.)

In January, 2007, White received another telephone call from Bryant. Bryant told White

that an insurance investigator was bugging him about the care of Eleanor. Bryant told White that

if the investigator called White, that White should not talk to the investigator, but tell the

investigator that White's lawyer told him not to answer any questions. Shortly after this

telephone call, White met with Timothy Springer at the airport in Kansas City. (Tr. I. p. 130.)

Eleanor had another son, Fred Bryant ("Fred"), who lived in the St. Louis area. Around

Thanksgiving, 2005, Fred took Eleanor to his home. Fred and his wife cared for Eleanor in

their home until June, 2006. Since Fred was employed, he used the services of the Bon Vivant

Adult Care Center to care for Eleanor during the day. Fred paid for the cost of that care and

submitted his request for reimbursement to the John Hancock Life Insurance Company. The

insurance company paid that reimbursement request directly to Fred. Fred never received any

funds from Bryant for the care of Eleanor. Fred knew that Bryant was the person responsible for

any billing to the John Hancock Life Insurance Company for the care of Eleanor for 2005 and

2006, with the exception of the bill that Fred submitted for the care provided by the Bon Vivant

Adult Care Center. (Tr. I, p. 163 - 174, 189.)

After the insurance company started its investigation of the payments made to Jesse

White for the care of Eleanor, Bryant spoke with Fred concerning the insurance investigation.

Bryant admitted that he had billed the insurance company and that the company was investigating

his claims. During that contact, Bryant discussed the pending insurance company investigation

and Bryant's treatment of the investigators. Bryant then made a statement that, "a doctor friend

of [Bryant's] said . . . it wouldn't be the first time the insurance company was scammed." (Tr. I,

p. 178, 179.)

In March, 2007, Bryant was interviewed by the Ripley County Sheriff, Adam Whittom.

During that interview, Bryant said that he had a business deal with Jesse White. He said that Bryant had mailed in the paperwork to the insurance company reflecting that White cared for Eleanor. Bryant admitted that White had not cared for Eleanor, but that White had performed home maintenance services. Bryant also admitted that there was a period of time around December, 2005, when Eleanor went to live in St. Louis with Fred, and that Bryant continued to bill the insurance company just as if she were still being cared for in Bryant's home. (Tr. I, p. 190 - 191.)

After presentation of that evidence, the parties argued the case and the jury was instructed by the District Court. The case was then submitted to the jury. After due deliberation, the jury returned with its verdict, finding Bryant guilty on all three remaining counts of the Indictment.

### D.    The Presentence Report.

Following the trial, a Presentence Investigation Report (P.S.R.) was prepared by United States Probation Officer Denise J. Broom. The P.S.R. reflected Bryant's base offense level at 7, pursuant to U.S.S.G. § 2B1.1(a). Four levels were added because the loss was more than $10,000.00, pursuant to U.S.S.G. § 2B1.1(b)(1)(C). The Total Offense Level was calculated to be 11. (P.S.R. ¶ 20 - 29)

A Criminal History Category was calculated for Bryant. The P.S.R. reflected that Bryant's only previous felony conviction occurred on September 7, 2004, in the Circuit Court of Cape Girardeau County, Missouri, for Possession of a Controlled Substance - Crack Cocaine. The state court suspended the imposition of sentence after Bryant's guilty plea and placed him on probation for five years. That probation was suspended on November 14, 2008, and Bryant was placed in jail. On March 2, 2009, the state court revoked Bryant's probation and sentenced him

to a term of imprisonment of three years. (P.S.R. ¶ 32)

This conviction resulted in the assessment of three criminal history points, pursuant to U.S.S.G. § 4A1.1(c). Bryant was assessed two additional points because, at the time the federal offense conduct occurred, Bryant was serving a period of probation, pursuant to U.S.S.G. § 4A1.1(d). Bryant received a total of five criminal history points, resulting in a Criminal History Category of III. (P.S.R. ¶ 32, 38 - 40)

Bryant's Guideline range of imprisonment, with a total offense level of 11 and a Criminal History Category of III was 12 to 18 months. (P.S.R., ¶ 59) After the disclosure copy of the P.S.R. was issued, Bryant filed an objection, claiming that any restitution should be directed to the estate of Eleanor Bryant. Bryant also filed a Sentencing Memorandum, in which he asked for a downward variance. The Government filed a Sentencing Memorandum, requesting an upward variance from the Guideline range. Sentencing was set for June 24, 2009.

**E.     The Sentencing Hearing.**

A sentencing hearing was held on June 24, 2009. This Court overruled the objection filed by Bryant and sentenced him to a term of imprisonment of 18 months, to be followed by three years supervised release and a $300 special assessment. Bryant was also ordered to make restitution in the amount of $29,444.00 to the John Hancock Life Insurance Company.

**F.     The Appeal.**

On June 29, 2009, Bryant filed a notice of appeal. In that appeal, he raised three issues. In his first issue on appeal, Bryant argued that "the government failed to prove that his representation with respect to the actual provider of the health care was material under the

contract and as defined by the statute and jury instructions or that his false representations

deceived or intended to deceive the insurer on a material matter." Bryant's brief, p. 10. Bryant's

brief expanded on that theory by stating "that for purposes of a criminal fraud under the mail

fraud statute, the government must prove more than a deceit perpetrated on the insurance

company with respect to the identity of the care-giver." Bryant's brief, p. 11.

The appellate decision disposed of Bryant's claim, noting:

The record reflects that from November 2005 through January 2007,

> Weldon [Bryant] mailed reimbursement forms to John Hancock, all of
> which alleged that Weldon had paid [Jesse] White for care which, in
> reality, was never provided to Ms. Bryant by White. It is irrelevant that
> Weldon himself cared for Ms. Bryant prior to her move to Fenton because
> he was not a licensed nurse, a certified nurse's aide, nor any other type of
> qualified home care provider specifically listed in John Hancock's policy.
> John Hancock, influenced by Weldon's false claims of care, relied on
> Weldon's misrepresentations to send Weldon reimbursement checks for
> care John Hancock believed was being provided, although John Hancock
> was only obligated to reimburse the *actual charges* Ms. Bryant incurred
> for care provided by qualifying providers. These misrepresentations thus
> "influenced the intended victim," . . . and were therefor material.
> *United States v. Bryant*, 606 F.3d 912, 918 (8th Cir. 2010).

Bryant's second issue on appeal argued that this Court erred in imposing a

sentence of 18 months, asserting that the District Court (1) erred by inappropriately rejecting

Bryant's request for a downward departure based on an alleged overstated criminal history

category, (2) erred by inadequately explaining its reasons for sentencing, (3) erred in imposing

the federal sentence to be served consecutively to the state sentence, and (4) erred by

inappropriately weighing sentencing factors and also considered prohibited factors at sentencing.

Bryant's contentions as to each of these points were rejected by the appellate court. *United States*

*v. Bryant*, 606 F.3d 912, 918-20 (8th Cir. 2010)

Bryant's third appellate point argued that this Court erred in not awarding the restitution to the estate of Eleanor Bryant. The Eighth Circuit panel found that the John Hancock Life Insurance Company was the only entity that was harmed by Bryant's fraud, and the restitution was property awarded to them. *Id*., at 922.

Bryant's conviction and sentence was affirmed in all respects by the Eighth Circuit Court of Appeals in *United States v. Bryant*, 606 F.3d 912 (8th Cir. 2010).

## APPLICABLE LAW

### A.    NEED FOR EVIDENTIARY HEARING AND BURDEN OF PROOF

28 U.S.C. §2255 provides, in pertinent part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is not entitled to relief, the court shall . . . grant a prompt hearing thereon.

Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Court states:

> The motion, together with all the files, records, transcripts, and correspondence relating to the judgment under attack, shall be examined promptly by the judge to whom it is assigned. If it plainly appears from the face of the motion and any annexed exhibits in the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified.

When a petition is brought under Section 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing. In determining whether petitioner is entitled to an evidentiary hearing the court must take many of petitioner's factual averments as true, but the court need not give weight to conclusory allegations, self interest and characterizations, discredited inventions, or opprobrious epithets. *United States v. McGill*, 11 F.3d 223, 225 (1st Cir.

1993). A hearing is unnecessary when a Section 2255 motion (1) is inadequate on its face, or (2) although facially adequate is conclusively refuted as to the alleged facts by the files and the records of the case. *Id.*, at 225-6. See also *United States v. Robinson*, 64 F.3d 403 (8th Cir. 1995) *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).

When all the information necessary for the court to make a decision with regard to claims raised in a 2255 motion is included in the record, there is no need for an evidentiary hearing. *Rogers v. United States*, 1 F.3d 697, 699 (8th Cir. 1993). An evidentiary hearing is unnecessary where the files and records conclusively show petitioner is not entitled to relief. *United States v. Schmitz*, 887 F.2d 843, 844 (8th Cir. 1989); *Dall v. United States*, 957 F.2d 571, 573 (8th Cir.1992).

### B.   INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on a claim alleging ineffective assistance of counsel, the movant must satisfy the two-part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). Under *Strickland*, the movant must first show that the counsel's performance was deficient. 466 U.S. at 687. This requires the movant to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. Secondly, the movant must demonstrate that the deficient performance prejudiced the defense so as "to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. The movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

The Eighth Circuit has described the two-fold test as follows: (1) counsel's representation

fell below an objective standard of reasonableness; and (2) but for this ineffective assistance, there is a reasonable probability that the outcome of the trial would have been different. *Rogers v. United States*, 1 F.3d 697, 700 (8th Cir. 1993). More recently the Eighth Circuit has described the *Strickland* test as follows: "Whether counsel's performance was in fact deficient and, if so, whether the defendant was prejudiced by the inadequate representation. If we can answer 'no' to either question, then we need not address the other part of the test." *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000).

When evaluating counsel's performance, the court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Counsel's performance is considered objectively, and gauged "whether it was reasonable 'under prevailing professional norms' and 'considering all the circumstances.'" *Fields*, 201 F.3d at 1027, quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064-65. Counsel's challenged conduct is viewed as of the time of his representation. "And we avoid making judgments based on hindsight." *Fields*, 201 F.3d at 1027. A reviewing court's "scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

## DISCUSSION

**Ground one.  Ineffective Assistance of Counsel.
Counsel failed to present evidence that other persons
provided care to Eleanor Bryant.**

In this issue, Bryant claims that his attorney was ineffective for failing to present evidence that other persons had provided care for Eleanor Bryant and that Jesse White had never provided care to her. Bryant claims that this evidence would have established the "only practical defense."

The Indictment charged that Bryant engaged in a scheme to defraud the John Hancock Life Insurance Company by submitting false invoices for payment. The insurance company provided coverage that would allow Bryant to claim a reimbursement for actual expenses that he incurred for the care of the policy owner, Eleanor Bryant. The insurance company would only allow the reimbursement of expenses for persons providing Home Health Care if they were properly licensed in their field. (Insurance Policy, p. 13.) Jesse White was properly licensed as a Certified Nurses Assistant and could perform covered services for Ms. Bryant. If Bryant paid White for such services, the insurance policy would provide a reimbursement to Weldon Bryant for his actual expenses up to a total of $70 per day.

Jesse White testified that, after November 1, 2005, he did not perform any services for Eleanor Bryant. (Trial Tr., p. 123) The Indictment charged that Weldon Bryant submitted claim forms for services allegedly performed by White and paid for by Bryant on January 17, 2006, July 19, 2006, and January 18, 2007. So the only issue to be determined by the jury was whether those three claim forms were part of a scheme to defraud the insurance company.

Now Bryant claims that he paid other caregivers for services provided to Eleanor Bryant. This fact, even if true, would not provide a defense. No matter who else Bryant paid or why, he still submitted claim forms to the insurance company that represented that Jesse White performed services for Ms. Bryant. Those claim forms contained Bryant's representation that he paid Jesse White for those services; a claim that was fraudulent. Timothy Springer testified that the insurance company would never have paid out those claims if it had known that the services shown on the claim form were not either performed or paid for. (Trial Tr., p. 44.) Bryant is not entitled to a credit for other amounts paid to other caregivers; the only issue at trial was whether

the information on the claim forms was true or not.

This issue regarding other caregivers is nothing more than Weldon Bryant's failure to understand that his crime was completed when he mailed the invoices that contained his false representations that Jesse White performed services for Ms. Bryant. Once he put those false invoices in the mail, he was guilty of mail fraud as charged in the Indictment. His attorney was not ineffective for failing to raise an issue that would never have resulted in success.

The funds that the insurance company paid to Weldon Bryant were to reimburse him for expenses he incurred on his mother's behalf. Bryant did not have any right to any insurance proceeds other than by incurring actual expenses for her. In his Petition, Bryant has not stated who he paid (with one exception), how much he paid them, or why their expenses would have been covered under the insurance policy as a licensed home caregiver and under what policy provision. He has not shown any evidence that his conviction was wrongfully obtained or that he was not actually guilty of the crime. Bryant does not include any affidavits from any witnesses that would shed any light on what they would testify to or how their testimony would have affected his case. He merely assumes that their testimony would have provided a defense. However, unless their testimony established that Jesse White actually performed those services for Eleanor Bryant, that additional evidence would not have affected this case.

Any review of Bryant's attorney's performance is highly deferential and courts presume that Bryant's attorney's conduct falls within the wide range of reasonable professional assistance. *Anderson v. United States*, 393 F.3d 749, 753 (8th Cir.), *cert. denied*, 546 U.S. 882, 126 S.Ct. 221 (2005). Courts do not second-guess trial strategy or rely on the benefit of hindsight, and the attorney's conduct must fall below an objective standard of reasonableness to be found

ineffective. *Williams v. United States*, 452 F.3d 1009, 1013 (8th Cir. 2006). In evaluating Bryant's claim, this Court must consider the totality of the evidence presented at trial and the proffered testimony referred to by Bryant in his Petition. *Id*. In conducting this analysis, this Court must be mindful of (1) the credibility of all witnesses, including the likely impeachment of the uncalled witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution. *Id*.

In Bryant's case, his additional witnesses would have offered absolutely no defense to his charges. Bryant's crime was mail fraud, accomplished when he mailed invoices containing his false representations to the insurance company. These additional witnesses would only have testified to payments made by Bryant to them. But payments to other, unlicensed persons did not excuse Bryant's misrepresentations to the insurance company. His proposed defense is merely a red herring defense designed to focus the jury's attention on an issue which is not relevant to the charges. The outcome of the trial would not have been any different even with the addition of these witnesses. And, as is described further in Issue Four of this Response, Bryant's attorney actually did present evidence that Bryant made payments to other people for the care of Eleanor Bryant. He complains that his attorney did not call these other witnesses and ignores the fact that his attorney presented testimony on that very subject. Bryant has not shown that he was prejudiced by any actions of his attorney in not calling other witnesses. Bryant's attorney was not ineffective on this ground.

Decisions involving trial strategy are "virtually unreviewable" in a Section 2255 proceeding. *Loefer v. United States*, 604 F.3d 1028, 1030 (8th Cir. 2010). The decision not to call a witness is a virtually unchallengeable decision of trial strategy. *United States v. Staples*, 410

F.3d 1009, 1012 (8th Cir. 2006). Bryant has not shown any reason why his attorney's decision not to call other witnesses was the result of his attorney's deficient performance. Because of the problems inherent in hindsight analysis, courts indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. Because Bryant has not demonstrated that he was prejudiced by any failure to call additional witnesses, he cannot meet one of the two tests of *Strickland* and cannot prevail upon his Petition.

A claim similar to Bryant's was resolved in *United States v. Vazquez-Garcia*, 211 Fed. Appx. 544 (8th Cir. 2007). In that case, the defendant asserted his attorney was ineffective for failing to call a certain witness. The appellate court affirmed the denial of Vazquez-Garcia's petition, noting that he had not provided any affidavits of what the witness would have said or how that testimony would have changed the trial. Notably, Vazquez-Garcia's petition was denied without an evidentiary hearing.

Bryant's claim that his attorney was ineffective for failing to call witnesses is similarly defective. Bryant does not provide any statements from these purported witnesses. This claim should be denied without an evidentiary hearing.

At trial, on appeal, and finally, in this Petition, Bryant fails to grasp that the insurance policy owned by Eleanor Bryant would only provide reimbursements to him for actual expenses incurred for her care for payments to qualified caregivers. Bryant labors under the impression that he is entitled to some kind of credit for payments made to others. He is not, even if such payments were made. The terms of Eleanor Bryant's policy did not permit the reimbursement of expenses to anyone other than approved caregivers. The policy did not authorize payments for services that were not provided nor for caregivers who were not licenced to provide those

services. More importantly, the policy does not authorize Bryant to file fraudulent claims

asserting that qualified caregivers provided services, when, in fact, they did not. The proof at trial

was that Weldon Bryant submitted the insurance reimbursement claim forms, knowing full well

that Jesse White did not provide services as Bryant represented that had been rendered. That is

the hallmark of the mail fraud that Weldon Bryant committed; his knowledge that White

did not provide the services that Bryant claimed that he did.

Bryant's conviction does not rest on infirm grounds and his attorney was not ineffective.

**Ground two.  Ineffective Assistance of Counsel.**
**Counsel failed to listen to Bryant's statements; failed to**
**present evidence that other caregivers provided care to**
**Eleanor Bryant; that the insurance company paid benefits**
**to other health care providers.**

In this issue, Bryant claims that his attorney did not comprehend the nature of Bryant's

defense (other caregivers provided care to Eleanor Bryant), that his attorney did not understand

that the insurance policy was not a "reimbursement" policy, that Bryant claimed to have called

the insurance company to verify that the claim forms were acceptable to the insurance company

with Jesse White's signature even though he did not perform any services, that the insurance

company issued checks to other payees, that Bryant's brother was also a payee and that his

attorney forgot his name. In that allegation, Bryant claims that his attorney "did not show that

Fred [Bryant] was also POA [power of attorney] in St. Louis with ultimate goal of providing care

for Mom with proceeds of the policy, not for my profit."

This last statement is at the essence of Bryant's Petition. He seems to believe that, so long

as the money he stole from the insurance company was used for the benefit of Eleanor Bryant,

then he was not guilty of mail fraud. That assumption is simply incorrect. Bryant fails to offer

this Court any proof of what funds he expended on the care of Eleanor Bryant or how this evidence could have changed the verdict. The facts introduced at trial established that Weldon Bryant collected over $29,000 in funds from the John Hancock Life Insurance Company by his fraudulent misrepresentation that Jesse White provided nursing services to Eleanor Bryant. When Weldon Bryant asserts in his Petition that the collection of those proceeds was not for his profit, he confirms his misunderstanding about why he was convicted of mail fraud. Whether he understands it or not, Bryant was convicted of mailing false information to the insurance company in order to receive payments. The issues Bryant raises in this allegation simply show his refusal to accept any responsibility for his outright theft from the insurance company. There is absolutely no proof that Weldon Bryant spent any of the $29,000 for the care of Eleanor Bryant. But even if he would have, such payments would not have absolved him of criminal liability for his crimes. Bryant's claims in this allegation do not support any conclusion that his attorney was ineffective. His claims only support a conclusion that Bryant refuses to acknowledge his criminal acts of mailing the false information to the insurance company.

Bryant also contends that the insurance policy was not a "reimbursement" policy. The Eighth Circuit Court of Appeals, in its decision on this matter, noted that "[t]he policy only provided reimbursement of payment to in-home caregivers who qualified, under its terms, as 'Home Health Care Providers.'" *Bryant*, at 915, n.6. In that one sentence, the Court of Appeals destroys the validity of Bryant's argument that other, unlicensed caregivers could provide services for Eleanor Bryant as well as his contention that the policy was not a "reimbursement" type policy. While the company could pay other providers directly, Bryant himself could never be paid directly for services he rendered (family members were prohibited from receiving payments

for services under the policy); he could only receive reimbursements for "actual charges incurred." *Id*. n.6.

All of Bryant's arguments in this section have the same disability. They fail to address the fact that Bryant was convicted of mailing false information to the insurance company to induce a wrongful payment. Bryant still fails to acknowledge his criminal acts, but portrays his conviction as being caused by ineffective assistance of counsel. Bryant's attorney could not change the criminal acts committed by Bryant which led to his conviction. Bryant's attorney was not ineffective for failing to advance a defense that did not engage any of the elements of the charged offense. Bryant's attorney knew full well that presenting proof of payments to other caregivers was not a defense to Bryant's acts of mailing the false information in order to obtain the payments. His attorney was not ineffective at all.

Furthermore, as is pointed out in the discussion on Issue Four below, Bryant's attorney actually did present evidence that he paid other caregivers of Eleanor Bryant. Bryant's factual premise for this issue, that his attorney was ineffective for failing to introduce evidence that he made payments to other caregivers, is factually incorrect. Bryant's other claims were immaterial to the verdict and not worthy of discussion.

**Ground three.  Ineffective Assistance of Counsel.**
                    **Error in Closing Argument.**

In this argument, Bryant asserts that his attorney was ineffective for making a mistake in citing a provision from the insurance policy issued to Eleanor Bryant. The statement that Bryant's attorney made is set out as follows:

> Tilsen:          They're entitled to the $70 a day to pay for the care. You can read the insurance policy because it's in evidence. You won't find anywhere in there where it says, you can't pay a

relative for the home healthcare that you are provided.
(Trial Tr. II, pp. 71, 72.)

During rebuttal, the Government pointed out that this statement was incorrect:

Sorrell:    If I may start with one of the statements that [Mr. Tilsen]
            made, is that you can look at this insurance policy shown
            as Exhibit 1, and you would not be able to find a provision
            in that policy barring payment to a family member.
            Well, I would ask you to look at paragraph 3.1 on page
            16. And I'll read it to you, and I'll let you read it along
            with me. Because what it says is, "this policy does not
            cover care or treatment provided by a member of your
            immediate family." (Trial Tr. II, p. 74.)

Bryant conflates this error into an allegation that his attorney was ineffective to the point

where his conviction and sentence should be set aside. The controlling authority does not support

Bryant's conclusion.

As has frequently been observed, a defendant is entitled only to a fair trial, not a perfect

one. *United States v. Bently*, 706 F.2d 1498, 1511 (8th Cir. 1983), citing *Lutwak v. United States*,

344 U.S. 604, 619, 73 S.Ct. 481, 490 (1953). See also *United States v. Lighty*, 616 F.3d 321, 335

(4th Cir. 2010), citing *United States v. Hasting*, 461 U.S. 499, 508-09, 103 S.Ct. 1974 (1983)

("Given the myriad safeguards provided to assure a fair trial, and taking into account the reality

of the human fallibility of the participants, there can be no such thing as an error-free, perfect

trial, and . . . the Constitution does not guarantee such a trial.") Bryant received a fair trial, albeit

maybe not a perfect one. The statement made by his attorney was incorrect as far as the policy

language goes, but it had no effect on the result of this case. Bryant was not convicted based on

some misunderstanding of the terms of the insurance policy; he was convicted because he mailed

in false information to obtain money that he wasn't entitled to. Even if Bryant would have been

entitled to receive money for his services, he would not have been entitled to mail invoices to the

company for reimbursement of expenses that were never incurred or paid for. So this mistake by his attorney had no effect on Bryant's guilt or verdict.

Federal Rule of Criminal Procedure 52(a) provides that "any error, defect, irregularity, or variance that does not affect substantial rights *must be disregarded*." (Emphasis furnished.) The analysis of what constitutes a "substantial right" calls for an inquiry into whether the mistake had "substantial and injurious effect or influence in determining the jury's verdict." *United States v. Green*, 768 F.2d 247, 252 (7th Cir. 1986), citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946). Unless the error creates a significant risk of convicting an innocent person, it should be disregarded. *Green*, at 242.

The slight misstep made by Bryant's attorney did not affect Bryant's substantial rights and was harmless error. Because Bryant was charged with mail fraud (submitting false invoices), the exact terms of the insurance policy as to who could receive payments were irrelevant. Bryant was convicted because he submitted false invoices, not because he was an improper payee. His attorney's mistake in reading the policy did not cause an innocent person to be convicted, so the error, if any, is harmless. Because the policy terms were not relevant to the conviction, Bryant's attorney's mistake did not affect Bryant's substantial rights. His attorney was not ineffective because of that mistake.

**Ground four. Ineffective Assistance of Counsel.**
              **Failure to impeach two witnesses.**

In this issue, Bryant contends that his attorney was ineffective for "failure to impeach two witnesses who knowingly lied." Bryant does not point to a specific reference in the trial transcript as to what statement made by either witness would have been untruthful, but instead, leaves it to this Court and the Government to review the entire trial transcript to determine what

statements, if any, might fit within Bryant's allegation. Bryant claims that Jesse White's false statement occurred in two areas. The first area is Bryant's vague claim that this Court "cleared the courtroom indicating that Mr. White could be charged with a crime by US Assistant Sorrell and would he like to hire an attorney for this crime. Mr. Tilsen failed to impeach White for this lie . . ."

A fair review of the trial transcript reveals that this Court stopped the proceedings upon White testifying that he had lied when he told the insurance company agent that he did not sign the insurance claim forms. This Court recognized that White was admitting to facts that might expose him to criminal liability and wanted to make sure that White knew he could speak with an attorney before possibly incriminating himself. (Trial Tr. I, p. 132 - 139.) During that testimony, White confessed that he made a false statement to Timothy Springer denying that he signed the forms. Bryant's attorney did not have to force White to admit that he had previously made a false statement. White admitted the false statement in the Government's portion of his direct examination. There was nothing more for Bryant's attorney to do to show the jury that White had made a false statement. Bryant's attorney was not forced to impeach White since the Government brought out his previous false statement. However, Bryant's attorney did crossexamine White as to this issue:

> Tilsen: You told him some things that weren't completely accurate the first time through; was that right.

> White: Yes. (Trial Tr. I, p. 154.)

For some reason, Bryant seems to believe that his attorney should have done more to "impeach" White. White admitted his prior false statements. There is no question that the jury heard White's statements. There was nothing more that Bryant's attorney could have done to

bring this matter to the jury's attention.

The second claim of ineffective assistance that Bryant makes concerning the testimony of Jesse White is that his attorney failed to impeach White for "lying that he provided care for Mrs. Bryant knowing that he did not by my knowledge, all along, that he didn't provide any care, rather he only signed claim forms to effect payment pursuant to customer service knowledge."[1] The only issue at trial was whether Jesse White provided services to Eleanor White for the periods of time covered by the invoices mentioned in the three counts of conviction. Any testimony by Jesse White as to whether he provided services at any other time is simply not relevant to the issues at trial.

Bryant does not state how he would prove that any testimony of Jesse White was untruthful. He provides no affidavits, no statement from White recanting his testimony, no statements from other witnesses, only his own self-serving conclusions that his attorney was ineffective. Bryant does not cite to any specific reference in the transcript as to what testimony of White was false. Bryant's allegations as to this issue do not provide any basis for this Court to conclude that his attorney was ineffective. Without some basis to demonstrate that White's testimony was untruthful, Bryant can't establish that his attorney was ineffective for failing to prove additional false statements. In effect, Bryant faults his attorney for failing to prove a fact that Bryant himself hasn't fully alleged, much less proven. Bryant's allegations as to this issue

---

[1] This Court notes that Bryant's statement in his Petition, that White didn't provide any care to Eleanor Bryant, is a complete confession to the most important element at issue in his criminal charge; whether Bryant knew that White did not perform any services for Eleanor Bryant. This statement shows that Bryant was actually guilty and that the jury's verdict was justified. It also shows that the insurance company was deceived into paying benefits based on Bryant's false representations.

are nothing more than a complaint that his trial strategy was not successful. As many convicted defendants have discovered, an attorney is not ineffective simply because they were found guilty. The entire record shows that Bryant's attorney did a fairly good job impeaching the Government's witnesses when he could. But that wasn't enough to overcome the Government's evidence that overwhelmingly proved that Bryant was guilty as charged.

Bryant also asserts that his attorney was ineffective because he "failed to impeach [Sheriff] Whittom's testimony stating 'Bryant did not pay other caregivers' contrary to his sheriff report in discovery." Strangely enough, the trial transcript discloses that the only attorney who asked any questions about payments to other caregivers was Bryant's attorney:

> Tilsen:      Didn't you question Mr. Bryant about who he employed to
>              help take care of his mother, and didn't he tell you that he was
>              paying some females between seven and fifteen dollars an
>              hour to help care for her, up to four hours a day?
>
> Whittom:     I believe that's also in my report, yes, sir. (Trial Tr. I, p. 194.)
>
> Tilsen:      There's no question in your mind that he told you that any
>              money, that the money he got from the insurance company
>              he paid the females that helped take care of his mother.
>
> Whittom:     I believe he stated that he paid the females between seven
>              to fifteen dollars an hour for periods of approximately four
>              hours a day. (Trial Tr. I, p. 194.)

Bryant asserts, in his Petition, that Whittom testified that Bryant said that he did not pay any other caregivers. The trial transcript clearly shows that Bryant's claim is contrary to the facts. His attorney asked that very question and got Bryant's self-serving answer that Bryant paid other caregivers. Bryant's attorney did exactly at trial what Bryant is now claiming that he didn't do. Rather than show ineffectiveness, the trial transcript demonstrates that Bryant's attorney was extremely competent and effective.

In this Petition, Bryant consistently maintains his defense theory that he should have a legal defense based on his payments to other people for their care of Eleanor. His Petition shows a fundamental lack of understanding of the charge he was convicted of, which was mail fraud. His act of mailing an invoice with his intentional, false representations for the purpose of obtaining money was the crime. Bryant was never entitled to a legal defense that he could claim some kind of "credit" for payments that he made to some other caregivers.

In this issue, Bryant also claims his attorney was ineffective for failing to raise these impeachment issues on appeal. As shown in the above argument, there was absolutely no basis for appealing these issues, because there is no factual basis to conclude that any false testimony occurred at trial. Bryant's attorney was not ineffective for failing to raise appellate arguments that would not have been successful on appeal.

**Ground five. Ineffective Assistance of Counsel.**
**Incorrect advice as to signing Waiver of Speedy Trial**
**rights; incorrect advice as to Bryant not testifying at**
**trial; incorrect advice as to pleading guilty to probation**
**violation which resulted in more criminal history points**
**and longer Guideline range.**

Bryant raises several, unrelated issues in this argument. First, he argues that his attorney was ineffective for failing to advise him of his right to a Speedy Trial. This argument is obviated by Bryant's own Speedy Trial Waiver. In that waiver, Bryant agreed to a continuance of his case, stating that "the ends of justice would best be served by executing said waiver and that such waiver would outweigh the best interest of the public and the Defendant to a speedy trial." The Government did not request a continuance of the trial setting; Bryant did. Now, he contends that he should not have signed that waiver and that the "Government was not prepared" for trial at the original setting. Once again, Bryant makes this conclusion without the slightest shred of proof.

In this case, the Government was certainly ready for trial. Bryant's contention that he would better have been served by trial on the original date because the Government would not have been prepared is not supported by any evidence and is factually incorrect. Bryant's own signed waiver is evidence that he made a knowing choice to continue his trial, a choice that the District Court granted solely at his request. Bryant does not show how he was prejudiced by the Court granting his request. Again, his attorney was not ineffective as to this issue.

Bryant also claims that his trial attorney advised him not to testify and that he now regrets that choice. He infers that his attorney's advice as to this issue was incorrect. However, the trial record clearly shows that this choice was Bryant's, and was his alone.

| | |
|---|---|
| Court: | Mr. Bryant, how old are you, sir? |
| Bryant: | I'm 51. |
| Court: | And you're an educated person, aren't you? Yes? |
| Bryant: | Yes, sir. |
| Court: | You have a high school degree at least? |
| Bryant: | Four-year degree, business administration. |
| Court: | Thank you. Your lawyer has represented to the Court that you have discussed the question of whether you should testify or not testify at some length; is that right? |
| Bryant: | Yes, sir. |
| Court: | And I want to just make sure for my own accord that you fully understand that right. You understand you have a right to testify and tell your side of the story. You know that, don't you? |
| Bryant: | Yes. |
| Court: | On the other hand, if, if you decide not to testify, of course |

|          |                                                                                                           |
|----------|-----------------------------------------------------------------------------------------------------------|
|          | nobody can force you or make you testify. But what I want you to understand, if you decide not to testify, as apparently your indication is now, nothing can be said to the jury about your failure to testify. You understand that, too, don't you? |
| Bryant:  | Yes, sir.                                                                                                 |
| Court:   | Now, you have had plenty of time to discuss this with your lawyer.                                        |
| Bryant:  | Ample time, yes.                                                                                          |
| Court:   | And do you feel like you are making an informed decision then not to testify in this case?                |
| Bryant:  | I'm comfortable with it 100 percent. (Trial Tr. II, p. 21, 22.)                                           |

Bryant was "100 percent" comfortable with *his* decision not to testify at trial. Now, having been convicted, he is having second thoughts. Yet Bryant makes no showing of what his testimony would have been. He leaves this Court and the Government to assume what he would have said and somehow, come up with a theory that his testimony would have helped in his case.

Bryant ignores the impeachment that would have followed his decision to testify. At the time of the trial, Bryant had been convicted in state court of Possession of a Controlled Substance - Cocaine Base. (P.S.R., ¶ 32 - 35.) Bryant's attorney knew full well that this subject would have been brought to the jury's attention if he had chosen to testify. By not testifying, Bryant was able to prevent the jury from hearing of his felony conviction. Bryant's decision not to testify appears to have been based on sound trial strategy, in spite of his post-conviction claims.

This Court understands that Bryant might have testified that he paid other people for caring for his mother. But Bryant's statement to that effect was introduced during the testimony of Sheriff Whittom, so he can't complain that the jury wasn't presented with that evidence. And with the addition of that testimony, it would not have changed the outcome of the

trial, since Bryant's payments to other caregivers, even if true, would not have provided a defense to a charge that he mailed fraudulent invoices to obtain payments he wasn't entitled to. Bryant has not shown how he was prejudiced by his decision not to testify; nor has he shown that the decision was not his alone.

Although an accused's right to testify is a fundamental constitutional right, it may be voluntarily and knowingly waived by him. *Jackson v. United States*, 928 F.2d 245, 248 (8th Cir. 1991). The trial transcript clearly shows that Bryant knowingly and voluntarily waived his right to testify.

More importantly, this Circuit has held that a habeas petitioner, such as Bryant, fails to state a claim on this issue if he fails to offer proof in his petition as to what his testimony would have been. Without such an offer of proof, this Court is without the means to determine what effect that Bryant's testimony would have had on the verdict. In *Hines v. United States*, 282 F.3d 1002 (8th Cir. 2002), the defendant claimed that his attorney was ineffective for failing to call him as a witness at trial. *Id.*, at 1004. The appellate court noted, "Petitioner . . . fails to provide any indication of how his testimony might have altered the outcome at trial. Accordingly, Hines failed to establish that the attorney's deficient performance prejudiced his defense . . ." *Id*. The Hines Court rejected his claim of ineffectiveness of counsel and affirmed the district court decision not to hold an evidentiary hearing on that matter.

In *Drew v. United States*, 46 F.3d 823 (8th Cir. 1995), the defendant claimed that his attorney was ineffective for incorrectly advising him not to testify at trial, the identical claim made by Bryant here. *Id.*, at 825-26. Drew, like Bryant, chose to make his allegation without providing any indication of what his testimony would be. The *Drew* Court found that "Even if

the advice of Drew's counsel could be viewed as somehow unreasonable, the omission of Drew's proposed testimony nevertheless falls well short of undermining our confidence in the outcome of the trial. (Citations omitted) Accordingly, we reject Drew's ineffective assistance of counsel claim." *Id*.

Because Bryant did not offer any evidence of what his testimony would have been at trial, this Court cannot determine whether his attorney's advice was competent or not. And because the burden of proof is upon Bryant for this issue, his claim may not be granted.

Bryant's final argument in this section is to complain that his attorney was ineffective because "the state attorney accepted Tilsen recommendation and sent me to state prison." The Government assumes that this "recommendation" was to confess his state probation violation. He then complains that this action, prior to his federal sentence, raised his criminal history category, resulting in a higher Guideline range.

The problem with Bryant's contention is that he does not show how his federal attorney could have continued the state case beyond the date of his federal sentencing. Once Bryant was found guilty beyond a reasonable doubt of the federal offense, the state court could use the verdict to revoke Bryant's probation. It didn't matter whether Bryant admitted his violation or not. Bryant's federal attorney had no voice in whether the state court case was continued or not. The timing of that action was entirely up to the state court judge. Bryant's federal attorney was not ineffective in failing to affect a state case in which Bryant had separate counsel.

**Supplemental Ground One.**

In this additional issue, Bryant claims that his attorney was ineffective for failing to present a "good faith" defense. Bryant seems to contend that his unsubstantiated payments to

other caregivers provides some kind of legal excuse for his submission of false invoices to the John Hancock Life Insurance Company. In effect, Bryant believes that, so long as he used the insurance company money for the benefit of Eleanor, he may not be convicted of the mail fraud used to acquire that money. Bryant's position is incorrect as a matter of law.

Bryant was convicted of three counts of mail fraud for mailing invoices to the insurance company that contained Bryant's false representation that he paid Jesse White for services rendered to Eleanor Bryant. That representation was completely false, at least as to the time periods contemplated by the charges. In his Section 2255 petition, Bryant completely ignores his conduct and avers that, if he used the money for Eleanor's care, he should be absolved of criminal liability. Bryant cites no law to that effect and this Court is unaware of any legal defense to the crime of mail fraud based on a defense of good faith, where that defense is attributable to the later use of illegally acquired money. Bryant's use of the monies that he illegally obtained from the insurance company provides no defense to his acts of misrepresenting facts in order to acquire the money. Bryant was guilty of each crime when he placed the false invoice in the mail. The subsequent use of the money does not change the nature of Bryant's acts, nor does it change the fact that Bryant only acquire the money by his false representation.

In this point, Bryant claims that his attorney "failed to present to jurors that Defendant intentions were to complete questionare (sic) forms to effect processing of check from American Republic to pay proceeds to caregivers." But Bryant ignores the very arguments of the attorney he now castigates as ineffective:

> Tilsen:    The acts that Mr. Bryant is accused of, have to be with the purpose
> of causing financial loss to another or a wrongful gain to oneself.
> And as we have discussed and as you have heard in this case, there
> hasn't been a loss to John Hancock. They paid money based on an

insurance policy for the long term care of Eleanor Bryant. *They would have paid that money if the right names of the people who had provided care were put, were put on the forms.* (Emphasis furnished.)

> If you conclude the Government hasn't convinced you beyond a reasonable doubt that there wasn't a loss to the John Hancock Insurance Company, that they didn't have to pay money they would have had to pay anyway, then your oaths as jurors require you to return a verdict of not guilty, and that would be just to do so.
> (Trial Tr. II, p. 65)

Bryant's attorney made the very argument that Bryant now claims wasn't presented to the jury. Bryant's claim in this issue is completely refuted by the record and may be denied by this Court without an evidentiary hearing.

Bryant's claimed defense of "good faith" is even more incredible when it is cast against the trial evidence of Bryant continuing to claim reimbursements based on his alleged payments to Jesse White even while Eleanor was being cared for in St. Louis by Bryant's brother. Bryant could not possibly claim that he was in good faith paying for Eleanor's care when she was living with Fred Bryant in St. Louis. The trial evidence showed that Eleanor was being cared for solely by Fred Bryant during that period. Fred Bryant testified that he cared for Eleanor from February, 2005, for the next six months. (Trial Tr. I, pp. 165-166) Fred Bryant did not receive any financial assistance from any other person during this time. (Trial Tr. I, p. 167) During this period of time, Weldon Bryant continued to apply for insurance reimbursements on false invoices. The assertion that Weldon Bryant used the money from the insurance company to care for Eleanor Bryant is clearly false and is another of his misrepresentations.

The facts of this case clearly demonstrate that Weldon Bryant illegally acquired money from the insurance company by his false representations that he paid Jesse White for services.

-33-

Bryant continued to steal money from the insurance company for well over a year, to the amount of nearly $30,000. Bryant ignores his own deceptions and lies, and then claims to have spent money on behalf of Eleanor which he fails to provide details for. But even if Bryant had spent all of the money for Eleanor's behalf, a proposition that is highly doubtful, his crime would still have been complete when he mailed the false invoices. Bryant acquired money by false representations sent through the United States Mails and he was rightfully convicted. His lawyer was not ineffective for failing to present some kind of "good faith" defense.

**Supplemental Ground Two.**

In this issue, Bryant claims that the CNCQ form, otherwise referred to as the insurance questionnaire or invoice, was not the "independent transaction upon which mail fraud must bear upon." His point appears to argue that insurance premiums had been paid for many years on the insurance policy, that Eleanor Bryant qualified for the policy benefits, and that because other caregivers were paid, there was no harm to the insurance company. Once again, Bryant fails to perceive exactly what acts of his constituted the crime he was convicted of. All of his factual assertions can be accepted as true, and he is still not entitled to relief. Bryant was convicted of placing false information on the CNCQ forms and mailing them for payments he was not entitled to. The Eighth Circuit Court of Appeals recognized Bryant's actions as fraudulent. That Court held that Bryant's misrepresentations were material and that they were intended to deceive the insurance company. *United States v. Bryant*, 606 F.3d 912 (8th Cir. 2010). Bryant's contentions in this issue are completely refuted by the appellate record.

In this issue, Bryant contends that "Congress designed [the mail fraud statute] to stop swindles against the unsuspecting public, not giant corporations who have security measures to

protect themselves through numerous audit mechanisms." Bryant seems to be arguing that the

mail fraud statute cannot be applied to ordinary swindlers, like himself, but only against persons

swindling the general public. He cites no authority to back up his claim as to what Congress

intended. His statements appear to be simply self-serving beliefs in what ought to be the law

instead of what the law actually is.

Bryant also faults his attorney for failing to demonstrate to jurors that this case was a civil

matter. Once again, Bryant is completely ignoring the record and the closing arguments of his

counsel:

> Tilsen: Now, if the John Hancock Insurance Company wanted to come here and sue the Bryant family because they think they should get their money back because there's a contract dispute over how that contract was carried out by the Bryant family in collecting on the insurance that Mrs. Bryant's paid for, that would be a different case for a different courtroom, and there would be different rules. (Trial Tr. II, p. 61.)
>
> . . .
>
> And if the John Hancock Insurance Company had come down here, they would only have to prove that it was more likely true than not that there had been some violation of their contract with the Bryant family for Eleanor's care, and they could win their lawsuit and get their money back. (Trial Tr. II, pp. 63, 64.)

Bryant's attorney clearly tried to convince the jury that this should be a civil, not criminal

case. That he was unsuccessful does not make the attorney ineffective. The record clearly

demonstrates that Bryant's attorney attempted to make the arguments that he now claims were

not presented to the jury. The records of this case refute Bryant's claims and he is not entitled to

a hearing on this issue.

**Supplemental Ground Three.**

In his third supplemental issue, Bryant claims that his attorney was ineffective for failing to demonstrate that Bryant intended to cause harm to the insurance company. He cites several allegations of fact to support this contention, including his "heartfelt love and sacrifice" to care for his mother, that he did not profit from the false claims, etc. Of course, the only way to present these issues was for Bryant to testify and thereby present his prior conviction to the jury. As a matter of trial strategy, Bryant's counsel (and Bryant) chose for him not to testify and to keep that conviction from the jury. But that decision foreclosed Bryant's ability to expand the record. Bryant is simply stuck with the choice that he made. Other witnesses could not testify as to his motivation or these other factors. That choice was not Bryant's attorney's fault. Bryant made the knowing decision not to testify. This decision barred his attorney from presenting any of these facts.

Bryant cannot demonstrate that he was prejudiced by this lack of evidence because none of his "evidence" provides a justifiable excuse for his false statement to the insurance company that Bryant paid Jesse White for services. That was the crime. Bryant poses no evidence that would change that fact.

**Supplemental Ground Four.**

In this issue, Bryant claims that his attorney and the Government misconstrued the insurance policy. Bryant claims that the insurance company would have made a windfall by not paying him the benefits. Again, this claim does not engage the crime for which Bryant was convicted. Even if the insurance company never paid a dime for Eleanor's care, that fact would not provide justification for Bryant filing false statements in order to acquire the payments. If the insurance company had refused to pay the claims, Bryant could still be prosecuted for the

complete crime of mail fraud, based on his mailing of the false invoices. Bryant was only entitled to a reimbursement for actual expenses that he paid. Bryant did not pay Jesse White any money, so any claim that Bryant made based on those false claims was a crime. Bryant was not convicted based on an insurance policy definition; he was convicted for mailing a misrepresentation that he had paid Jesse White when Bryant knew that he had not. This issue may be resolved without an evidentiary hearing because, even assuming that Bryant's statements in this issue are true, they would not entitle him to any relief.

**Supplemental Ground Five.**

In this ground, Bryant claims that his attorney was ineffective in cross examining Fred Bryant, his brother. Bryant claims that his attorney should have had Fred Bryant testify as to the terms of the insurance policy as to who was qualified to receive payments. Bryant seems to contend that the insurance company could have been required to pay these other caregivers. Bryant refuses to recognize that his crime was not for paying other caregivers; it was for mailing invoices that contained his false representations. Bryant seems to assert that he could bill the insurance company on the false representation that he paid Jesse White and that misrepresentation would be forgiven if he turned around and paid other caregivers. Bryant is simply mistaken as to whether this issue could have affected his cae.

Bryant's alleged payments to other caregivers is not an issue in this case. His mailing of fraudulent invoices is the only issue. This issue is refuted by the records of the case and may be denied without an evidentiary hearing.

**Supplemental Ground Six.**

In this ground, Bryant seems to make a claim that he was an approved payee on the

insurance policy. This Court fails to understand how that designation would legally enable

him to submit false invoices to the insurance company. Bryant's designation as a payee does not

absolve him of responsibility for his criminal acts of submitting false information to the

insurance company in order to obtain payments for which he was not entitled to receive. The

records of the case demonstrate that Bryant is not entitled to any relief on this claim.

## CONCLUSION

For the foregoing reasons, Bryant's § 2255 motion is **DENIED**.

**SO ORDERED** this 28th day of December, 2011.

STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE